IN UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RLI INSURANCE COMPANY | : | Civil Action No. 1:14cv802, 1:14cv869 |
| | : | |
| Plaintiff, | : | Judge: Sandra S. Beckwith |
| | : | Magistrate: Stephanie K. Bowman |
| Vs. | : | |
| | : | |
| FIFTH THIRD BANCORP | : | |
| | : | |
| Defendant. | : | |

**RLI'S AMENDED RULE 30(B)(6) NOTICE OF DEPOSITION**

TO: See Attached Certificate of Service

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 30(b)(6), RLI Insurance Company ("RLI") will take the deposition of Representative Deponent(s) of Fifth Third Bancorp ("Fifth Third") on **April 6, 2016 at 9:00 a.m.** and continuing until completed, before an officer authorized to administer oaths by the laws of Ohio. The deposition will be taken at the law offices of Reminger Co., LPA, 525 Vine St., # 1700, Cincinnati, OH 45202 and will be recorded both stenographically and by video.

RLI requests that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Fifth Third designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf to testify regarding the matters listed in the **Matters of Examination** of the **Deposition Rider** identified below as Exhibit A.

Dated: March 9, 2016

RESPECTFULLY SUBMITTED,

/S/ Scott L. Schmookler
**Scott L. Schmookler (Pro Hac Vice)**





tabbies EXHIBIT 2

**Regina L. Ripley (Pro Hac Vice)**
**Ji-Yeon Suh (Pro Hac Vice)**
GORDON & REES LLP
One North Franklin, Suite 800
Chicago, IL 60606
Phone: (312) 565-1400
Emails: sschmookler@gordonrees.com
rripley@gordonrees.com
jsuh@gordonrees.com

**Robert W. Hojnoski (0070062)**
REMINGER CO. LPA
525 Vine Street, Suite 1700
Cincinnati, OH 45202
Phone: (513) 721-1311
Emails: rhojnoski@reminger.com

*Attorneys for RLI Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2016, I circulated a copy of the foregoing via electronic mail to the following:

Mark J. Byrne
Kenneth F. Seibel
JACOBS, KLEINMAN, SEIBEL & MCNALLY
30 Garfield Place
Cincinnati, OH 45202
Email: mbyrne@jksmlaw.com
kseibel@jksmlaw.com

Charles E. Turnbull
Lawrence M. Scott
Marc D. Kaszubski
O'Reilly Rancilio P.C.
12900 Hall Road, Suite 350
Sterling Heights, MI 48313
Email: cturnbull@orlaw.com
lscott@orlaw.com
mkaszubski@orlaw.com

*Attorneys for Fifth Third Bancorp*

Luke Busam
Bryan S. Strawbridge, Esquire
Julia Blackwell Gelinas, Esquire
Frost Brown Todd LLC
3300 Great American Tower
301 E. Fourth Street
Cincinnati, OH 45202
Emails: jgelinas@fbtlaw.com
bstrawbridge@fbtlaw.com
lbusam@fbtlaw.com

*Attorneys for Defendant Continental Insurance Company, Fidelity and Deposit Insurance Company, St. Paul Mercury: Insurance Company*

David P. Kamp, Esquire
Brian D. Goldwasser, Esquire
Jean Geoppinger McCoy, Equire

White, Getgey & Meyer Co. LPA
Fourth and Vine Tower
One West Fourth Street, Suite 1700
Cincinnati, OH 45202
Emails: dkamp@wgmlpa.com
bgoldwasser@wgmlpa.com
jmccoy@wgmlpa.com

John W. Blancett, Esquire
Christopher J. Losquadro, Esquire
Christopher C. Novak, Esquire
Sedgwick LLP
Brookfield Place
225 Liberty Street, 28th Floor
New York, NY 10281-1008
Emails: John.Blancett@sedgwicklaw.com
Christopher.Losquadro@sedgwicklaw.com
Christopher.Novak@sedgwicklaw.com

*Attorneys for Defendant Certain Underwriters at Lloyd's Subscribing to Policy Numbers B0509QA048710 and B0509QA051310, Axis Insurance Company and Federal Insurance Company*

/S/ Ji-Yeon Suh

**JI-YEON SUH (Pro Hac Vice)**
*Attorney for RLI Insurance Company*

**EXHIBIT A – RULE 30(b)(6) DEPOSITION RIDER**

**DEFINITIONS**

1. "You, "Your," and "Fifth Third" mean Fifth Third Bancorp and its officers, directors, employees, agents, independent contractors, parent corporations, subsidiary corporations, affiliates, predecessors and successors."

2. "Ross " means Matthew P. Ross.

3. "InsCap" means InsCap Capital Management, LLC and its affiliated entities, now known as "Concord Capital Management, LLC" and referred to in RLI's Complaint as "Concord."

4. "LIPF II" means the $100 million loan facility that Fifth Third established for InsCap called "Life Insurance Premium Financing Program II, LLC."

5. "Ultra" refers to InsCap's premium finance program of the same name.

6. "Counterclaim" means the Counterclaim that Fifth Third filed in the instant action on November 25, 2014.

7. "Bond" means either or all of the primary, first excess and second excess bonds identified in Paragraph 1 of RLI's Complaint.

8. "Claimed Loans" means any and all loans, extensions of credit, or transactions in connection with which you seek recovery in this matter, including the "Ultra loan facility and other credit facilities" referenced in paragraph 4 of your Counterclaim.

9. "Claimed Loss" means any amounts you seek to recover in this litigation.

10. "Proof of Loss" means the proof of loss submitted by Fifth Third in support of the claim at issue in this litigation.

11. "Primary Bond" means the primary financial institution bond at issue in this case and identified as Market Reference No. B0509QA048710.

12. The "Excess Bonds" means the first excess financial institution bond at issue in this case and identified as B059QA051310 and the second excess financial institution bond at issue in this case and identified as 81906760.

13. "LIPF Advances" means the advances under the Ultra loan facility, and identified on Exhibit A.1 hereto.

**Matters of Examination**

Pursuant to Federal Rule of Civil Procedure 30(b)(6), you are hereby requested to designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf to testify regarding the following matters:

1. Your policies, procedures, and guidelines relating to underwriting, analysis, and approval of loans involving any of the following groups at Fifth Third in 2006 to 2010: Insurance Finance, Asset Securitization, ESOP, Structured Finance, Capital Markets and Corporate Banking during the time period of 2006-2010.

2. The underwriting, review, analysis and approval of the Claimed Loans and LIPF II Advances.

3. The underwriting, approval, valuation, and funding of each of the LIPF II Advances and Claimed Loans.

4. All communications with InsCap relating to the Claimed Loans.

5. Any auditing performed on the Claimed Loans.

6. Your attempts to recover your Claimed Loss.

7. Any auctions or sale of the life insurance policies pledged as collateral for the Claimed Loans and/or LIFP Advances, and the amounts received by Fifth Third as a result of any such auctions/sales.

8. Fees charged and received on each of the Claimed Loans and/or LIFP Advances.

9. The calculation of any loss claimed by Fifth Third, any loss alleged in the Counterclaim and any loss sought by Fifth Third in its Proof of Loss, and the factual basis for any allegation that any such loss is covered under the Primary Bond.

10. The factual basis for the allegation (in the Proof of Loss) that Fifth Third sustained a loss in the amount excess of $100 million.

11. The date and amount of any payments, including interest and fees, received in connection with LIPF II, Ultra, the Claimed Loans and LIFP Advances.

12. Fountain Square as it relates to the Claimed Loans, including (but not limited to) the creation, structure and funding thereof, the mechanics of funding a loan through Fountain Square, the owners of Fountain Square, the source of any money used to fund loans through Fountain Square, and the identity of the individuals who made the decision to fund through Fountain Square.

13. In 2006-2010, the mechanics of funding each of the Claimed Loans through Securitization, the decision to do so, the mechanics of such funding, the source of the money, and the policies and procedures for the funding.

14. The timing and substance of any conversations, correspondence, and documents exchanged with InsCap relating to LIPF II, Ultra, InsCap, Ross, the Claimed Loans and/or LIPF Advances.

15. The timing and substance of any conversations, correspondence, and documents exchanged with LaSalle Bank, Bank of America, Wilmington Trust relating to LIPF II, Ultra, InsCap, Ross, the Claimed Loans and/or LIPF Advances.

16. The timing and substance of any conversations, correspondence, and documents exchanged with Jim Rechel relating to LIPF II, Ultra, InsCap, Ross, the Claimed Loans and/or LIPF Advances.

17. The timing and substance of any conversations, correspondence, and documents exchanged with David Dorr, Brian Dorr and/or Dorr Asset Management relating to LIPF II, Ultra, InsCap, Ross, the Claimed Loans and/or LIPF Advances.

18. Fifth Third's due diligence and investigation of InsCap, Gary Brecka, Edward Netherland, Harish Raghavan, Ira Brody, Rita Hill, InsCap principals, and/or Life Asset Group and Legacy Life LLC in relation to LIPF II and/or Ultra.

19. Fifth Third's due diligence and investigation of InsCap, Gary Brecka, Edward Netherland, Harish Raghavan, Ira Brody, Mark Leiman, Rita Hill, InsCap principals, and/or Life Asset Group and Legacy Life LLC during the years 2006, 2007, 2008, 2009, and 2010.

20. Fifth Third's due diligence and investigation of Columbus Nova Investments IV, Ltd. ("Columbus Nova") and its affiliated entities from 2008 through present.

21. Fifth Third's internal monitoring and management of LIPF II and/or Ultra.

22. Fifth Third's internal investigation of Ross and the results of that investigation.

23. Fifth Third's policies and/or procedures relating to the investigation of alleged fraud and/or alleged employee dishonesty during 2009 and 2010.

24. The identification of each Fifth Third employee, law firm, officer, director, investigator, and/or agent who was involved in the investigation of Ross's alleged dishonesty, including the date said employee, law firm, officer, director, investigator, and/or agent became involved and the nature of the activities they undertook relating to the investigation.

25. Any and all Fifth Third employees who received, reviewed, and read Clayton Bruce's memoranda (attached hereto as Exhibit A.2) and the date such receipt and/or review took place.

26. Any and all individuals interviewed by Fifth Third in its investigation into the alleged fraud and/or employee dishonesty alleged in the Counterclaim and Proof of Loss, the date each interview took place, and the identify of the interviewer.

27. Susan Clayton's investigation into Ross and/or any fraud alleged in the Counterclaim, including (but not limited to) each step in her investigation, and the results of her investigation.

28. Jill Brown's investigation into Ross and/or any fraud alleged in the Counterclaim, including (but not limited to) each step in her investigation, and the results of her investigation.

29. Darrin Steinmann's investigation into Ross and/or any fraud alleged in the Counterclaim, including (but not limited to) each step in his investigation, and the results of his investigation.

30. Graeme Jack's investigation into Ross and/or any fraud alleged in the Counterclaim, including (but not limited to) each step in his investigation, and the results of his investigation.

31. Jennifer Froede's investigation into Ross and/or any fraud alleged in the Counterclaim, including (but not limited to) each step in her investigation, and the results of her investigation.

32. Nancy Picknay's investigation into Ross and/or any fraud alleged in the Counterclaim, including (but not limited to) each step in her investigation, and the results of her investigation.

33. The lawsuit by Fifth Third in the matter of *Fifth Third Bank v. Concord Capital Mgt. et al*, No. 2010 L 006868, filed in Cook County, Illinois, and the factual basis for the allegations in the pleadings filed therein.

34. Fifth Third's communications and cooperation with the FBI and U.S. Attorney in its investigation of Ross.

35. Conversations, correspondence, and documents exchanged between Fifth Third and the FBI concerning InsCap, Ira Brody, Ultra, the Claimed Loans, Edward Netherland, Columbus Nova, and/or Ross.

36. The factual basis for the allegations contained in your Counterclaim and Proof of Loss.

37. Each of the "dishonest and fraudulent acts within the meaning of the Bonds" (as alleged in Paragraph 7 of the Counterclaim) allegedly committed by Ross.

38. Every person and/or entity with whom Ross allegedly colluded. For each such person, the factual basis for asserting collusion with that person/entity, the identity of the individuals who first learned of and/or discovered the alleged collusion and the date on which Fifth Third learned of the alleged collusion.

39. How and when Ross allegedly first learned that the protections described in Paragraph 7c of the Counterclaim did not exist, including the date on which Ross allegedly first learned that the protections described in Paragraph 7c of the Counterclaim did not exist.

40. How and when, as alleged in Paragraph 7c of the Counterclaim, Fifth Third first learned that the protections identified therein did not exist, including: (a) the date on which any Fifth Third officer or employee (other than Ross) first learned that Ross made alleged misrepresentations; (b) how, when, and to whom Fifth Third first learned that the protections identified in Paragraph 7c of the Counterclaim did not exist; and (c) the identity of every Fifth Third officer or employee (other than Ross) who was, prior to 2011, made aware of fraudulent misrepresentations in connection to the alleged protections.

41. How and when, as alleged in Paragraph 7d, Ross allegedly first learned of the alleged "affiliation" between InsCap and Life Asset Group/Gary Brecka, including the date on which Ross allegedly first learned of the alleged affiliation.

42. How and when, as alleged in Paragraph 7d, Fifth Third first learned of the alleged affiliation between InsCap and Life Asset Group/Gary Brecka, including: (a) the date on which any Fifth Third officer or employee (other than Ross) first learned of the alleged affiliation; (b) how, when and to whom Ross first disclosed the alleged affiliation; and (c) the identity of every Fifth Third officer or employee who was, prior to 2011, made aware of the alleged affiliation.

43. How and when Ross allegedly first learned, as alleged in Paragraph 7e, that Ultra was not "viable…without the use of fraudulent valuations and fee payments which resulted in Fifth Third Bank's loans being substantially under-collateralized by actual policy values,"

including the date on which Ross allegedly first learned that Ultra was not "viable without the use fraudulent valuations and fee payments."

44. How and when, as alleged in Paragraph 7e, Fifth Third first learned that Ultra was not "viable...without the use of fraudulent valuations and fee payments which resulted in Fifth Third Bank's loans being substantially under-collateralized by actual policy values," including: (a) the date on which any Fifth Third officer or employee (other than Ross) first learned that Ultra was not "viable...without the use of fraudulent valuations and fee payments which resulted in Fifth Third Bank's loans being substantially under-collateralized by actual policy values"; (b) how, when and to whom Ross first disclosed that Ultra was not "viable...without the use of fraudulent valuations and fee payments which resulted in Fifth Third Bank's loans being substantially under-collateralized by actual policy values"; and (c) the identity of every Fifth Third officer or employee who was, prior to 2011, made aware that Ultra was not "viable...without the use of fraudulent valuations and fee payments which resulted in Fifth Third Bank's loans being substantially under-collateralized by actual policy values."

45. How and when, as alleged in Paragraph 7f, Ross allegedly first "colluded with InsCap and its principals...by creating and failing to disclose fraudulent documentation used to secure Ultra loans," including the date on which Ross allegedly first learned that InsCap submitted "fraudulent documentation" and the names of the individuals with whom he colluded.

46. How and when Fifth Third first learned, as alleged in Paragraph 7f, that Ross allegedly "colluded with InsCap and its principals...by creating and failing to disclose fraudulent documentation used to secure Ultra loans," including: (a) the date on which any Fifth Third officer or employee (other than Ross) first learned that Inscap submitted fraudulent

documentation; (b) the date on which any Fifth Third officer or employee (other than Ross) first learned that Ross allegedly colluded with InsCap; and (c) the identity of every Fifth Third officer or employee who was, prior to 2011, made aware of the fraudulent documentation.

47. How and when Ross allegedly first learned, as alleged in Paragraph 7g, of the "fraudulent 'credit fees' and other fraudulent payments from Fifth Third Bank fundings in the Ultra program for the benefit of InsCap's principals," including the date on which Ross allegedly first learned about the "fraudulent 'credit fees' and other fraudulent payments."

48. How and when Fifth Third first learned, as alleged in Paragraph 7g, about the "fraudulent 'credit fees' and other fraudulent payments from Fifth Third Bank fundings," including: (a) the date on which any Fifth Third officer or employee (other than Ross) first learned about the "fraudulent 'credit fees' and other fraudulent payments"; (b) the date on which any Fifth Third officer or employee (other than Ross) first learned that Ross allegedly "permitted the payment of fraudulent 'credit fees' and other fraudulent payments"; (c) how, when and to whom Ross first disclosed the "fraudulent 'credit fees' and other fraudulent payments"; and (d) the identity of every Fifth Third officer or employee who was, prior to 2011, made aware of the "fraudulent 'credit fees' and other fraudulent payments" identified in Paragraph 7g.

49. How and when Ross allegedly first learned, as alleged in Paragraph 7h, that monies advanced by Fifth Third "for the stated purpose of purchasing life insurance policies" were used for another purpose, including the date on which he allegedly first learned that monies advanced by Fifth Third "for the stated purpose of purchasing life insurance policies" were used for another purpose.

50. How and when Ross allegedly first learned that InsCap induced Fifth Third to advance money to finance non-existent life insurance policies, including the date on which he learned that InsCap induced Fifth Third to advance money to finance non-existent life insurance policies.

51. How and when Fifth Third first learned that advances were used to finance non-existent life insurance policies, including: (a) the date on which any Fifth Third officer or employee (other than Ross) first learned that that advances were used to finance non-existent life insurance policies; (b) the date on which any Fifth Third officer or employee (other than Ross) first learned that Ross allegedly approved advances that were used to finance non-existent life insurance policies; (c) how, when and to whom Ross first disclosed that advances were used to finance non-existent life insurance policies; and (d) the identity of every Fifth Third officer or employee who was, prior to 2011, made aware that advances were used to finance non-existent life insurance policies.

52. How and when Ross allegedly first learned, as alleged in Paragraph 7j, of the "conversion of $2 million from an Ultra funding" and that the converted $2 million would allegedly be represented to Fifth Third as belonging "to an InsCap principal and would serve as collateral for additional funds advanced by Fifth Third to InsCap," including the date on which Ross allegedly first learned of the conversion and the misrepresentation.

53. How and when Fifth Third first learned, as stated in Paragraph 7j, of the "conversion of $2 million from an Ultra funding" and that Ross allegedly misrepresented that the "converted $2 million belonged to an InsCap principal and would serve as collateral for additional funds advanced by Fifth Third Bank to InsCap," including: (a) the date on which any

Fifth Third officer or employee (other than Ross) first learned that the $2 million was allegedly converted from an Ultra funding; (b) the date on which any Fifth Third officer or employee (other than Ross) first learned that Ross allegedly misrepresented that the converted $2 million "belonged to an InsCap principal and would serve as collateral"; (c) how, when and to whom Ross first disclosed the conversion of the $2 million allegedly from an Ultra funding; and (d) the identity of every Fifth Third officer or employee who was, prior to 2011, made aware of the conversion.

54. The "ongoing financial business and personal transactions with InsCap principals," as alleged in Paragraph 7l, that Ross allegedly maintained.

55. How and when Ross allegedly first learned that InsCap submitted forged documents to Fifth Third, including the date on which Ross allegedly first learned that InsCap submitted forged documents.

56. How and when Fifth Third first learned that InsCap submitted forged documents to Fifth Third, including: a) the date on which any Fifth Third officer or employee (other than Ross) first learned that InsCap submitted forged documents to Fifth Third; b) how, when and to whom Ross first disclosed that InsCap submitted forged documents to Fifth Third; and (c) the identity of every Fifth Third officer or employee who was, prior to 2011, made aware that InsCap submitted forged documents to Fifth Third.

57. Every financial benefit, including "in-kind and personal entertainment benefits," that Fifth Third claims, alleges and/or asserts that Ross received in relation to LIPF II, Ultra and/or the Claimed Loans. The identity of the individuals who first learned of and/or discovered such financial benefit(s) and the date such discovery was made.

58. All financial benefits that you allege Ross received, including (but not limited to) the "substantial financial benefits," "off the books" financial transactions and "numerous in-kind and personal entertainment benefits" that you allege in Paragraph 8 of the Counterclaim.

59. The identity of the person(s) who allegedly discovered the $75,100 deposit, as alleged in paragraph 8 of the Counterclaim, into Ross's bank account.

60. The factual basis for the allegations in paragraph 7 of your Counterclaim.

61. The facts supporting the allegation in paragraph 12, and the individuals and/or firms involved, of the Counterclaim that "Fifth Third has conducted a detailed investigation of the fraud perpetrated on Fifth Third Bank and Ross' involvement in the fraud …".

62. The facts supporting the allegation in paragraph 13 of the Counterclaim that "RLI has failed to investigate the claim in a reasonable or appropriate time or manner."

63. The facts supporting the allegation in paragraph 20 of the Counterclaim that "RLI has breached its contract…"

64. The facts supporting the allegation in paragraph 21 of the Counterclaim that "RLI has acted in bad faith…"

65. For each of the Claimed Loans, the factual basis for Fifth Third's claim that the loss thereon "result[ed] directly from dishonest or fraudulent acts committed by an Employee with the intent to make and which results in . . . (i) a financial benefit for the Employee, or (ii) a financial benefit for another person or entity with whom the Employee committing the dishonest or fraudulent act was in collusion, provided that the Insured establishes that the Employee intended to participate in the financial benefit. . . ."

66. The factual basis for Fifth Third's claim that discovery occurred on January 30, 2011, as alleged in the Notice of Claim, Proof of Loss, and the Counterclaim.

67. The factual basis for Fifth Third's allegation in its Proof of Loss and Counterclaim that Ross colluded with InsCap, Gary Brecka, Edward Netherland, Harish Raghavan, Ira Brody, Rita Hill, InsCap principals, and/or Columbus Nova, Life Asset Group and Legacy Life LLC.

68. How and when Ross allegedly learned, for the first time, of the fraud being perpetrated by InsCap, Gary Brecka, Edward Netherland, Harish Raghavan, Ira Brody, Rita Hill, InsCap principals, and/or Columbus Nova, Life Asset Group, and Legacy Life LLC.

69. The date on which Ross allegedly agreed to participate in a fraud on Fifth Third.

70. Any alleged financial benefit Ross allegedly received from InsCap, Gary Brecka, Edward Netherland, Harish Raghavan, Ira Brody, Rita Hill, InsCap principals, and/or Columbus Nova, Life Asset Group, and Legacy Life LLC.

71. Answers to RLI's interrogatories and the factual basis for such answers.

72. The identification of all correspondence contained in Fifth Third's privilege logs attached hereto as Exhibit "A" and Exhibit "B".

73. The facts Fifth Third relies upon in concluding that each correspondence or document identified in its privilege logs is protected by the work product doctrine because these documents were prepared after Fifth Third anticipated litigation. This person should be prepared to testify to the facts Fifth Third relied upon in concluding that the correspondence or documents were prepared in anticipation of litigation and are protected by the work product doctrine, and the identification of the person who came to such conclusion.

74. The facts Fifth Third relies upon in concluding that each correspondence or document identified in its privilege logs (Exhibits A and B) is protected by the attorney client privilege. This person should be prepared to testify to the facts Fifth Third relied upon in concluding that the correspondence or documents involved the advice of counsel and the identification of the person who came to such conclusion.

75. Fifth Third's search for documents responsive to RLI's request for production. This shall include a person to testify as to the efforts undertaken by Fifth Third to search for any electronically stored information (ESI), the process used to search for ESI, the custodians of any ESI for which a search was undertaken, and any keywords utilized in that search. This person shall also be prepared to testify as to the identification of individuals who contributed to each of Fifth Third's interrogatory responses and the substance of their contribution to those responses.

76. The date of the initiation of any litigation hold implemented by Fifth Third in response to any of the issues raised in Fifth Third's Counterclaim. This person should be prepared to testify as to the efforts undertaken by Fifth Third in instituting a litigation hold.

77. The date Fifth Third anticipated litigation against RLI for coverage under the Bond for the claim it asserts in its Proof of Loss and Counterclaim, the identity of the individual/s who came to this conclusion, and the facts upon which Fifth Third relied upon in concluding that litigation was anticipated against RLI.

78. Application for, negotiations over and purchase of any financial institution bond from 2006 through 2009.

79. Any communications with Marsh relating to the Primary Bond or Excess Bonds.

80. The factual basis for Wilson Stewart's representation that "there are no incidents that we know of that are expected to result in subsequent claims."

81. The identity of the person or entity who drafted the terms of the Primary Bond.

82. Fifth Third's relationship with Marsh and any agreements between Fifth Third and Marsh.

83. Fifth Third's policies and/or procedures in 2008, 2009, and 2010 relating to the reporting of potential losses to its insurance and bond carriers and the identity of the individuals at Fifth Third responsible for such reporting.

84. Fifth Third's policies and/or procedures in 2008, 2009, and 2010 relating to negotiating and obtaining insurance and bond coverage and the identity of the individuals at Fifth Third responsible for such reporting.

85. The facts which support Paragraph 13 and Count I of the Counterclaim, including your claim that "RLI has failed to investigate the claim in a reasonable or appropriate time or manner" and that "RLI has breached its contract as set forth in the Bonds."

86. Any communications with or disclosures received from Skadden Arps.

87. Ross' employment, including any interview thereof and investigation into his background and prior employment.